IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| KASHA WILLIAMS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | No. 3:07-CV-1834-K |
| | § | |
| MERCK & COMPANY, INC., | § | |
| and GRACE PELKOWSKI, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendants Merck & Company, Inc. ("Merck") and Grace Pelkowski (collectively, "Defendants") Motion for Summary Judgment (Doc. No. 29). Following review and consideration of the motion, response, reply, pleadings on file in this case, summary judgment evidence, and the applicable law, the Court **GRANTS** Defendants' Motion for Summary Judgment, and dismisses Plaintiff's claims with prejudice.

## I.     Factual and Procedural Background

Merck is in the business of research, development, manufacture, distribution, marketing, promotion, and sale of human health products.  Merck markets and sells its products to hospitals, doctors, and pharmacies in the United States.  As part of its operations, Merck employs professional representatives to deliver product information and medical education to hospitals, doctors, and pharmacies.  A large portion of a

representative's job involves calling on doctors and "detailing" the Merck products for which the representative is responsible.  A "detail" is a balanced presentation to a doctor concerning the benefits of, and clinical data surrounding, a Merck product.

May 2001, Kasha Williams began working for Merck in the Longview and surrounding areas as a professional representative.  She was the only African-American in the Longview territory.  Williams had no job-related complaints until a new supervisor was assigned to her region.

March 2004, Grace Pelkowski began serving as the Merck business manager for the Dallas District, which included Longview, Texas, where Williams worked.  Pelkowski supervised Williams from March 2004 until Williams's resignation in January 2008.  Pelkowski was responsible for leading a team of professional representatives.  Merck set particular sales and market-share goals for Pelkowski.  To achieve these objectives, Pelkowski had to ensure that the representatives met their sales quotas.

Typically, representatives travel from their homes to doctors' offices throughout their assigned territories without day-to-day supervision.  But, Merck requires business managers to conduct mandatory "field visits" in order to supervise and interact with representatives.  Field visits are periodic meetings during which the business manager accompanies a representative while he or she calls on doctors.  These visits allow the manager to observe the representative's performance first-hand, while providing feedback and coaching based on those observations. Some field visits are scheduled ahead of time,

with advance notice to the representative involved; others are unscheduled and unannounced.  Merck believes these unscheduled field visits have the advantage of providing the business manager with a more candid picture of how the representatives operate on a day-to-day basis.

Each Merck representative is generally paired with a counterpart.  The two counterparts coordinate with each other and independently conduct calls within their territory.  They are equally accountable for achieving the sales and market-share objectives set for that territory and for their assigned products.  When they fail to meet these objectives, their business manager must rate them as performing "below objective." Williams's counterpart was Lance Noll, a Caucasian male.

Williams's and Noll's sales and market-share numbers fell below objective.  As a result, Pelkowski rated Williams and Noll as "below objective."  Because Longview's sales and market-share figures continued to fall below objective, Pelkowski asked Williams and Noll to formulate an "Acceleration Plan" designed to accelerate the territory's sales.  Among other things, this Acceleration Plan called for Williams and Noll to compress their routing schedule from a three-week rotation to a two-week rotation. That is, instead of visiting each doctor in their territory once every three weeks, they would visit each doctor every two weeks.  This compressed schedule was intended to increase Williams's and Noll's contact with prescribers, thereby enhancing sales. Pelkowski considered this schedule to be an important part of the Acceleration Plan, as

Williams and Noll had successfully used the tactic in 2005.  Eventually, the two-week routing schedule was abandoned, because Williams thought the routing was "overwhelming."  Also, as part of the Acceleration Plan, Pelkowski had Williams draft a list of her strengths and weaknesses.  Williams believed that this list would eventually be used against her for disciplinary reasons.

While abandoning the Acceleration Plan is no joking matter; violating Merck policy is even more serious.  Merck has an established policy regarding "sampling"—that is, the practice of providing doctors with samples of Merck products to get patients started on prescriptions.  Merck policy strictly prohibits "oversampling."  Because samples are not intended to replace actual prescriptions, Merck policy requires that samples be provided in limited, reasonable amounts; regardless of whether a doctor demands a larger quantity.  For example, leaving an entire case of samples (containing more than 1,000 tablets) at a single doctor's office, is considered unreasonable.  When a business manager receives information that a representative is oversampling, he or she is responsible for counseling that representative and bringing him or her into compliance with Merck policy.

During a September 5, 2006 field visit with Noll, Pelkowski witnessed a full case of Merck products sitting on the floor at a doctor's office.  It was still in its cardboard shipping box, and bore a label with Williams's name on it.  This amount of sampling was

excessive under Merck policy—particularly since the doctor's sample closet was already fully stocked—and thus constituted oversampling in violation of that policy.

Moreover, because Merck's products are prescription medicines—and are thus regulated by the Prescription Drug Marketing Act—Merck must properly account for how samples are distributed.  Representatives must keep meticulous records of their sampling activities from the time they receive the samples until they disburse them to doctors. After conducting a routine audit, Merck's Sample Accountability Office had discovered that Williams failed to properly record some of her disbursements. Consequently, Williams received a "Sample Compliance Memo."  Williams had previously received a Sample Compliance Memo on another occasion in May 2004. Pelkowski played no part in generating either of Williams's Sample Compliance Memos or conducting the routine audits from which they arose.

Additionally, Williams made similar recording errors—such as misidentifying the doctors who signed for the samples and recording incorrect lot numbers.  These errors required Merck's Sample Accountability Office to intervene and correct the Company's records.

On September 6, 2006, on a field visit with Williams, Pelkowski conducted Williams's mid-year performance review—an informal oral discussion designed to assess the representative's current position and make any needed adjustments before year-end. Pelkowski informed Williams about the improper sampling practices she had observed

the previous day.  In response, Williams replied that she had become frustrated and overwhelmed with the job, and that she was not sure she could continue working with Pelkowski.  At this time, Williams did not raise discrimination issues.

Despite Pelkowski's warning regarding oversampling, on November 17, 2006, Pelkowski learned that Williams had again violated Merck's sampling policy.  Williams left full, unopened cases of Merck products at two separate doctors' offices in Texarkana. Both cases bore a label with Williams's name.

Williams also had problems with Merck's driving policy.  Pelkowski received a report on Williams's "dashboard" indicating that Williams had been identified as an at-risk driver.  A dashboard report reflects various objective data relating to a representative's performance and policy compliance—including such items as sampling status, compliance with expense guidelines, and driver-safety issues.  According to Williams's dashboard, she had been involved in multiple relatively recent traffic incidents and, as a result, was considered an at-risk driver.  Merck considers this a major issue, because representatives spend a large amount of time driving.  Under Merck's policy, a valid driver's license is a condition of employment to be a representative. Representatives who have been designated as at-risk drivers are in jeopardy of losing their jobs. Merck's Fleet Management group enforces this policy by periodically checking representatives' driving records to detect traffic violations, accidents, and other incidents that may indicate unsafe driving practices.  When Fleet Management discovers such

information, the representative's manager receives an automatically generated report that shows up on the employee's dashboard report.

November 13, 2006, on a field visit with Williams, Pelkowski addressed Williams's driving record with her. Williams replied that she had four additional traffic tickets that the dashboard report did not reflect. Merck policy required Williams to notify Pelkowski about such incidents within 24 hours of these tickets—but Williams had failed to do so. Later, Williams provided a copy of her driving record that reflected three speeding tickets in the previous thirteen months. In addition, she had been involved in collisions while operating her Company vehicle. Eventually, as required by Merck policy, Pelkowski issued Williams a compliance memorandum addressing her driver-safety issues. Williams later complained that her driving record was audited more than other Merck representatives.

On October 25, 2006, Pelkowski conducted a field visit with Williams in Texarkana. During that call, Williams made several sales calls that Pelkowski believed did not live up to her previous performance levels and failed to comply with Merck's Quality Customer Selling ("QCS") sales model. Generally speaking, the QCS model is a mandatory sales approach designed to ensure that Merck's representatives adequately addressed prescribers' needs. Pelkowski believed that Williams's approach did not comport with the QCS model.

Williams later complained that Pelkowski conducted more surprise field visits with her than other representatives, would interrupt her during her presentation with doctors, and at times addressed Williams in a sarcastic manner by referring to Williams as a "superstar."

In November 2006, due to chest pains, Williams took short-term disability leave. While on leave, Williams contacted Elizabeth Lyle in Merck's Ombudsman's office, Ann Myers in Merck's Human Resources department, and Marc Dervishian, Pelkowski's supervisor, to complain about Pelkowski. Williams did not assert race discrimination in any complaint. During this same time period, Williams alleges that her job position was posted as "vacant" on Career Builder. Pelkowski, however, asserts the posting was to fill a different position.

On December 1, 2006, Williams returned to work. December 18, 2006, Williams met in person with Pelkowski and Dervishian in Merck's Irving, Texas offices to discuss her complaints about Pelkowski. Dervishian had flown in from Atlanta specifically for this meeting. Jennifer Robichaud from Human Resources attended by telephone. Dervishian asked Williams to describe her concerns with Pelkowski. Williams raised various complaints about Pelkowski's managerial tactics, however, she never said anything about discrimination. Ultimately, Williams remained under Pelkowski's supervision.

On January 2, 2007, Williams submitted a resignation letter stating that she would leave the Company's employment effective January 16, 2007.  The letter did not mention discrimination or retaliation.

On April 30, 2007, Williams filed the first of two charges of discrimination.  In her initial charge, she claimed that Pelkowski discriminated against her by evaluating her performance unfairly.  According to Williams, these evaluations constituted race and sex discrimination under Title VII.  She specified that the alleged discrimination began in September 2006 (when she and Pelkowski disagreed about the routing schedule) and ended on January 2, 2007 (the day she submitted her resignation letter).  Williams cross-filed the charge with both the EEOC and the Texas Workforce Commission ("TWC").  The EEOC notified Merck about the charge on May 2, 2007—the same day it issued a no-cause finding and dismissed the charge. The TWC sent a right-to-sue letter relating to this charge to Williams's counsel on July 31, 2007.

On July 24, 2007, Williams filed a second charge of discrimination.  In this second charge, she claimed that Merck posted her position on November 28, 2006—some 238 days before she filed the charge, and while she was on short-term disability leave.  According to Williams, this job posting constituted retaliation for her complaint about Pelkowski and disability discrimination under the Americans With Disabilities Act.  As in her first charge, Williams alleged that the discrimination began in September 2006 and ended on January 2, 2008 (203 days before she filed the charge).

- 9 -

Again, she cross-filed with the EEOC and the TWC.  That same day, the EEOC issued a no-cause finding, dismissed the charge, and notified Merck that the charge had been filed. According to agency records, the TWC has never issued a right-to-sue letter on this second charge.

On September 13, 2007, Plaintiff filed this lawsuit in the district court of Dallas County, Texas, 162nd Judicial District.  Plaintiff asserted claims of race discrimination and retaliation under the Texas Labor Code, and named both Merck and Pelkowski as defendants. Defendants removed to this Court based on diversity jurisdiction under 28 U.S.C. § 1332, because the amount in controversy appears to exceed $75,000 excluding interest and costs, Plaintiff is a Texas citizen and Merck is a New Jersey corporation with its principal place of business in New Jersey, and that Pelkowski, a Texas citizen, was improperly joined.  Plaintiff moved to remand.  But, the Court denied Plaintiff's motion because there was no reasonable basis to predict that Plaintiff might be able to recover against Defendant Pelkowski.  Defendant Pelkowski is not a proper party to the lawsuit and therefore is dismissed.  Thus, the Court has proper jurisdiction pursuant to 28 U.S.C. § 1332.  Plaintiff does not assert sex discrimination or disability discrimination claims in this lawsuit. Nor does she assert any claims under Federal law—a point she emphasized in her motion to remand.  Accordingly, this case presents two claims under the Texas Labor Code: race discrimination and retaliation.

II.    **Legal Standard**

Summary judgment is appropriate when the pleadings, affidavits, and other summary judgment evidence show that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *U.S. Philips Corp. v. Iwasaki Elec. Co.*, 505 F.3d 1371, 1374 (Fed. Cir. 2007).  The moving party bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 322–25.  Once a movant makes a properly supported motion, the burden shifts to the nonmovant to show that summary judgment should not be granted; the nonmovant may not rest upon the allegations in the pleadings, but must support the response to the motion with summary judgment evidence showing the existence of a genuine fact issue for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255–57 (1986).

In considering whether genuine issues of material fact exist, the court must determine whether a reasonable jury could return a verdict for the nonmoving party in the face of all evidence presented.  *Id.* at 249.  All evidence and reasonable inferences must be viewed in the light most favorable to the nonmovant.  *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

## III.    Analysis

Merck seeks summary dismissal of Williams's claims, contending that Williams cannot raise a genuine issue of material fact with regard to any of her claims, and that

therefore it is entitled to judgment as a matter of law.  For the reasons stated below, the Court agrees.

### A.      Race Discrimination

Williams's discrimination claims arise under the Texas Labor Code.  The Texas Labor Code is "intended to correlate state law with federal law in employment discrimination cases." *AutoZone, Inc. v. Reyes*, 272 S.W.3d 588, 592 (Tex. 2008). Therefore, courts look to federal law to interpret the statute's provisions. *Id.*; *Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 476 (Tex. 2001).

Texas law prohibits an employer from discharging or discriminating against an employee due to the employee's race. Tex. Lab. Code § 21.051; *AutoZone, Inc.*, 272 S.W.3d at 592.  In the context of race discrimination, Williams must present sufficient direct or circumstantial evidence to enable a reasonable jury to find that her race was a motivating factor in Merck's discrimination and constructive discharge of Williams. *See Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 652 (5th Cir. 2004) (addressing Title VII claims for race, color, religion, sex, or national origin discrimination ).  "'Direct evidence is evidence that, if believed, proves the fact of discriminatory animus without inference or presumption.'" *West v. Nabors Drilling USA, Inc.*, 330 F.3d 379, 384 n.3 (5th Cir. 2003) (quoting *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir. 2002)). A plaintiff who offers "sufficient direct evidence of intentional discrimination should prevail, just as in any other civil case where a plaintiff meets his burden." *Nichols v. Loral*

*Vought Sys. Corp.*, 81 F.3d 38, 40 (5th Cir. 1996) (citing *Portis v. First Nat'l Bank of New Albany, Miss.*, 34 F.3d 325, 328 n.6 (5th Cir. 1994)).  Williams has not adduced direct proof of race discrimination, therefore, she must rely on circumstantial evidence.

When direct evidence is unavailable, a plaintiff can prove discrimination using the "modified McDonnell Douglas approach." *Rachid v. Jack In The Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004).  As modified, *McDonnell Douglas* consists of three stages.  First, Williams must establish a *prima facie* case of discrimination, which "creates a presumption that [Merck] unlawfully discriminated against [her]." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981).  The burden then shifts to Merck to articulate a legitimate, non-discriminatory reason for Williams's discharge. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-07 (1993).  Merck's burden is one of production, not proof, and involves no credibility assessments. *West*, 330 F.3d at 385.  Finally, if Merck meets its production burden, then Williams may proceed under one of two alternatives: the pretext alternative or the mixed-motives alternative. *Rachid*, 376 F.3d at 312.  Under the pretext alternative, Williams must "offer sufficient evidence to create a genuine issue of material fact . . . that [Merck's] reason is not true, but is instead a pretext for discrimination." *Id.* (internal quotation marks omitted).  Under the mixed-motives alternative, Williams must offer sufficient evidence to create a genuine issue of material fact "that [Merck's] reason, while true, is only one of the reasons for

its conduct, and another motivating factor is [her] protected characteristic[.]" *Id.* (internal quotation marks omitted).

Williams asserts that she was racially discriminated against in two ways: (1) by subjecting her to a racially hostile work environment; and (2) by treating her differently than non-African American employees.  Williams most likely does not make out a *prima facie* case of race discrimination on either basis.

### 1.    Racially Hostile Work Environment

To establish a claim of racial harassment based on a hostile work environment, Williams must establish four elements: (1) she belongs to a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment was based on her race; and (4) the harassment affected a term, condition, or privilege of her employment.  *Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 353 (5th Cir. 2001).

Williams asserts that Pelkowski created a racially hostile work environment by asking Williams to prepare a list of strengths and weaknesses, conducting unscheduled field visits with Williams, sarcastically referring to Williams as a "super star," posting Williams's sales position while Williams was on disability leave, repeating language to Williams that Williams used in her complaint to Human Resources and to Pelkowski's superiors, and interrupting Williams while Williams was conducting sales calls with physicians.

To establish racial motivation, Williams must identify conduct that has "a racial character or purpose." *Harris-Childs v. Medco Health Solutions, Inc.*, No. 4:03-CV-77-Y, 2005 WL 562720, at *6 (N.D. Tex. Mar. 10, 2005), *aff'd*, 169 Fed. Appx. 913 (5th Cir. 2006) (not selected for publication).  Stated differently, Williams must demonstrate a "connection between the allegedly harassing incidents and [her] protected status"—here, her race.  *Id.*

Williams concedes that Pelkowski—at times—treated her and Caucasian representatives as equally poor.  For example, she admitted that former Merck representative Jennifer Knight "had similar encounters with Grace Pelkowski [and] felt forced to leave the company."  She also said that Merck representative Cortney Spurger said "she was afraid she was next on Grace's list of people to get rid of and was very upset [and said] 'Kasha, I think she is after me now.'"  Both Knight and Spurger are Caucasian.  Similarly, in a detailed statement to the EEOC, Williams said that former Merck representatives Scott Beadle and Jody Westbrook received similar treatment:

> According to what Scott Beadle, a past Merck representative who reported to Grace Pelkowski said to me on a phone conversation immediately following his decision to leave Merck, the words Grace said to me were frighteningly almost exact to what she'd said to him prior to his decision to resign and go to work for another company.
> * * *
> From what I have seen and have been told, Jody [Westbrook] was unjustly fired from Merck based on a technicality. Jody tried to retain her job by reaching out to Human Resources; however, Grace Pelkowski was willing to go as far as necessary to terminate or force Jody out of Merck.
> * * *

- 15 -

It was not until Grace began attacking me in September 2006, that it was crystal clear to me, what Jody Westbrook had suffered through.

Beadle and Westbrook—like Knight and Spurger—are also Caucasian. Furthermore, Williams concedes that Pelkowski had non-discriminatory reasons for her actions, such as, that Pelkowski was angry that Williams did not follow the two-week routing schedule and that sales were down.

To be actionable, alleged harassment must affect a term, condition, or privilege of the plaintiff's employment. *Celestine*, 266 F.3d at 353. To meet this threshold, the harassment must have been "sufficiently severe or pervasive so as to alter the conditions of employment and create an abusive working environment." *Id.* Merely sporadic harassment will not suffice; rather, it must permeate the workplace. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993). The Supreme Court has left no doubt that, to reach this level, the challenged conduct must be "extreme." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). To reach this level, "'there must be a steady barrage of opprobrious racial comments.'" *McCray v. DPC Indus., Inc.*, 942 F. Supp. 288, 293 (E.D. Tex. 1996) (quoting *Bolden v. PRC, Inc.*, 43 F.3d 545, 551 (10th Cir. 1994), *cert. denied*, 116 S.Ct. 92 (1995)).

To determine whether a work environment is sufficiently "hostile" to support a discrimination claim, courts generally consider four factors: (1) the frequency of the conduct; (2) its severity; (3) whether it was physically threatening or humiliating, or

merely an offensive utterance; and (4) whether it unreasonably interfered with the plaintiff's work performance.  *Harris*, 510 U.S. at 23.

In *Dixon v. Moore Wallace Inc.*, the plaintiff alleged that her supervisor had taken various actions that she found upsetting, such as "treat[ing] her differently from others in the group concerning matters like task lists and report requirements," making "unsupportive" comments to her, issuing written warnings to her, yelling at her repeatedly, using profanity, and pacing "threateningly outside her cubicle." No. 3:04-CV-1532-D, 2006 WL 1949501, at *1–2 (N.D. Tex. July 13, 2006), *aff'd*, 236 Fed. Appx. 936 (5th Cir. June 7, 2007).  The plaintiff found these events so stressful that she went to her doctor, told her employer that she was medically unable to return to work, and ultimately resigned.  *Id.* at *10.  The Court held that the plaintiff's allegations did not describe a "hostile" work environment at all, let alone an environment that would support a claim for race discrimination: "[a] reasonable trier of fact could not find from this evidence that [plaintiff's] workplace environment was such that a reasonable person would find it hostile, much less that any hostility was based on her race."  *Id.* at *11.

Williams racially hostile work environment allegations do not rise to the level to support a claim based on race discrimination, therefore, Williams must rely on disparate treatment to establish a claim for race discrimination.

To establish a *prima facie* case of race discrimination, Williams must show that she (1) is a member of a protected class, (2) was qualified for the position, (3) was subject

to an adverse employment action, and (4) was replaced by someone outside the protected class, or, in the case of disparate treatment, show that other similarly situated employees were treated more favorably. *Bryan v. McKinsey & Co.*, 375 F.3d 358, 360 (5th Cir. 2004); *Wheeler v. BL Dev. Corp.*, 415 F.3d 399, 405 (5th Cir. 2005). Merck concedes that Williams can establish the first two elements, however, Merck contends Williams cannot meet the last two elements.

With regard to an adverse employment action, Williams identifies two potential promotions that she did not receive and that she was constructively discharged. Williams sought two promotions: a job-structure promotion from Professional Representative II to Senior Professional Representative and a lateral promotion to Merck Vaccine Division ("MVD"). With regard to the promotion to Senior Professional Representative, Williams was ineligible for such a promotion because she never achieved above-average sales and market-share figures. Indeed, Noll—Williams's Caucasian counterpart—did not receive this promotion for the same reason.

As to the lateral promotion to MVD, Pelkowski did not make the MVD promotion decision—another manager made the decision. But, Pelkowski did speak with the manager before Williams interviewed for the position. What Pelkowski told the manager, however, is unclear.

To prove a constructive discharge, Williams "must establish that working conditions were so intolerable that a reasonable employee would feel *compelled* to resign."

- 18 -

*Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 566 (5th Cir. 2001) (emphasis added) (quoting *Faruki v. Parsons*, 123 F.3d 315, 319 (5th Cir. 1997)).  In other words, the resignation must effectively be involuntary: "the general rule is that if the employer deliberately makes an employee's working conditions so intolerable that the employee is forced into involuntary resignation, then the employer has committed a constructive discharge." *Ugalde v. W.A. McKenzie Asphalt Co.*, 990 F.2d 239, 242–43 (5th Cir. 1993).

A constructive discharge claim requires a "'greater severity or pervasiveness of harassment than the minimum required to prove a hostile work environment.'" *Benningfield v. City of Houston*, 157 F.3d 369, 378 (5th Cir. 1998) (quoting *Landgraf v. USI Film Prods.*, 968 F.2d 427, 429 (5th Cir. 1992),  *aff'd*, 511 U.S. 244, 114 S. Ct. 1483, 128 L. Ed. 2d 229 (1994)).  To be actionable, a constructive discharge requires aggravating factors.  *Landgraf*, 968 F.2d at 430 (citing *Pittman v. Hattiesburg Mun. Separate Sch. Dist.*, 644 F.2d 1071, 1077 (5th Cir. 1981)).  Thus, because Williams cannot establish a hostile work environment claim, her attempt to prove a constructive discharge claim fails.

In examining whether a reasonable employee would have felt compelled to resign, the Fifth Circuit has considered the following factors: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or

(7) offers of early retirement or continued employment on terms less favorable than the employee's former status. *Brown v. Bunge Corp.*, 207 F.3d 776, 782 (5th Cir. 2000) (quoting *Barrow v. Bunge Corp.*, 10 F.3d 292, 297 (5th Cir. 1994)); *see Tyler v. Union Oil Co. of Cal.*, 304 F.3d 379, 394 (5th Cir. 2002). Williams's argument centers around the sixth factor—harassment calculated to cause the employee to resign, however, the Court cannot conclude that this factor alone made Williams's working conditions so intolerable that a reasonable employee would have felt compelled to resign.

While Williams most likely does not establish the third factor for race discrimination (as shown above), she does, however, make a stronger argument that the fourth factor—replaced by someone outside the protected class or similarly situated employee is treated differently—is established. Williams asserts that Noll is a similarly situated employee outside the protected class that is treated differently. For instance, Williams claims Merck did not investigate Noll regarding oversampling, Noll's driving record was not separately audited, there is no evidence that Noll's sale's skills were scrutinized on field visits, Noll's position was not posted when he was absent from work, and Noll was not held responsible for abandoning the two-week routing schedule. Furthermore, Williams alleges that she was replaced by a non-African American.

Overall, Williams most likely fails to establish a *prima facie* case of race discrimination, however, Williams's race discrimination claim fails regardless because—as shown below—she fails to create a genuine issue of material fact that

- 20 -

Merck's non-discriminatory reasons for its actions are false, or that, Williams's race was a motivating factor for Merck's conduct.

Assuming Williams established a *prima facie* case of racial discrimination, Merck must provide legitimate, non-discriminatory reasons for its actions relating to Williams. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506–07 (1993). Merck contends that actions taken by Pelkowski were based on legitimate, non-discriminatory reasons. For example, Pelkowski learned that Williams violated Merck policies, including its policy against oversampling and its driver-safety policy. Also, Pelkowski's job required her to conduct field visits with all her representatives and to provide the representatives with honest feedback about their performance. Pelkowski states that she viewed Williams's performance during their 2006 field visits as substandard.

In the Fifth Circuit, employers receive substantial deference in making personnel decisions. The law was "not intended to be a vehicle for judicial second-guessing of employment decisions, nor was it intended to transform the courts into personnel managers." *Bienkowski v. American Airlines, Inc.*, 851 F.2d 1503, 1507–08 (5th Cir. 1988) (citing *Thornbrough v. Columbus & Greenville R. Co.*, 760 F.2d 633, 647 (5th Cir. 1985)). Accordingly, courts have recognized that "anti-discrimination laws do not require an employer to make proper decisions, only non-retaliatory [or non-discriminatory] ones." *LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 391 (5th Cir. 2007).

Williams's response to rebut Merck's non-discriminatory reasons for its actions is simply that Merck's reasons are false.  Williams circularly argues that if Merck's reasons were true then Merck would have disciplined Williams for her inappropriate conduct such as violations of Merck's driving policy or sampling policy.  But, this argument only strengthens Merck's position that Pelkowski's actions related to Williams's conduct rather than to Williams's race.  Williams concludes that Merck's actions were discriminatory, however, Williams's subjective opinions fail to raise a fact issue as to whether Merck's non-discriminatory reasons were false or if race discrimination was a motivating factor for Merck's actions.  *See Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1189 (5th Cir. 1997) (holding unsupported testimony is nothing more than a subjective opinion that is incompetent as evidence to establish discrimination).

Williams does not produce any evidence to raise a genuine issue of material fact that Williams's race was a motivating factor in regards to Pelkowski's actions.  Therefore, Williams race discrimination claim fails.

**B.    Retaliation**

Williams alleges that Pelkowski retaliated against her in violation of Texas law.  Tex. Lab. Code § 21.055 (Vernon 2009).  Her retaliation claim fails because the claim is time-barred, but nevertheless, fails on the merits.

- 22 -

Williams did not raise a retaliation claim for her first discrimination claim.  She failed either to check the "retaliation" box or to include any factual allegations to support such a claim.  Instead, she waited until July 24, 2007 to file a second charge, in which she alleged that Merck had advertised her position in retaliation for her complaints about discrimination.  This second charge, however, came 238 days after the posting was published (November 28, 2006) and 203 days after she resigned (January 2, 2007).

The Texas Labor Code requires that administrative charges be filed within 180 days after the date the alleged unlawful employment practice occurred.  Tex. Lab. Code § 21.202(a) (Vernon 2009).  This 180-day limitations period is both mandatory and jurisdictional, and begins when the employee is informed of the allegedly unlawful decision.  *Specialty Retailers, Inc. v. DeMoranville*, 933 S.W.2d 490, 492 (Tex. 1996). When the employee fails to file a charge within the 180-day period, yet brings a lawsuit on the untimely claim, summary judgment is appropriate.  *Pope v. MCI Telecomms. Corp.*, 937 F.2d 258, 263–64 (5th Cir. 1991) (affirming summary judgment where plaintiff filed retaliation claim 217 days after the challenged decision); *Ashcroft v. HEPC-Anatole, Inc.*, 244 S.W.3d 649, 650–51 (Tex. App.—Dallas 2008, no pet.) (affirming dismissal with prejudice where plaintiff filed charge more than 200 days after termination).

The alleged retaliation ended on January 2, 2007, when Williams resigned—that is the date she included on her second charge.  Williams learned about the job posting

on December 8, 2006, nearly a month later.  Even using the January 2, 2007 date as a starting point, Williams filed her second charge 23 days late.  Accordingly, the claims in that charge are time-barred.  It does not matter that Williams checked the "continuing action" box on her second charge.  It is undisputed that the alleged retaliation stopped on January 2, 2007, when Williams tendered her resignation.  First, this is the end date that Williams put on both her charges.   Second, Williams has not identified any retaliatory action that occurred after her resignation.  Moreover, Williams's final contact with Pelkowski was on January 4, 2007, when Pelkowski retrieved Williams's company vehicle and other Merck property.  Therefore no retaliation occurred—or could have occurred—after Williams resigned.  Accordingly, because she failed to file her charge within that 180-day period, her retaliation claim is time-barred and summary judgment is appropriate.

Moreover, Williams's retaliation claim fails on the merits.  Like Title VII, the Texas Labor Code prohibits retaliation against any employee who opposes a discriminatory practice or participates in proceedings or investigations under the statute.  Tex. Lab. Code § 21.055 (Vernon 2009).  Retaliation claims under the Texas statute are interpreted coextensively with Title VII.  *Young v. Houston Lighting & Power Co.*, 11 F. Supp. 2d 921, 931 n.10 (S.D. Tex. 1998).  Retaliation claims follow the same burden-shifting approach used in Title VII disparate-treatment cases.  *Strong v. Univ. Healthcare*

- 24 -

*Sys., L.L.C.*, 482 F.3d 802, 805–06 (5th Cir. 2007); *Long v. Eastfield Coll.*, 88 F.3d 300, 304 (5th Cir. 1996).

Accordingly, Williams must first establish a *prima facie* case comprising the following elements: (1) that she engaged in a protected activity; (2) that an adverse employment action occurred; and (3) that there was a causal connection between her protected activity and the adverse employment action. *Pineda v. United Parcel Serv., Inc.*, 360 F.3d 483, 487 (5th Cir. 2004). If she fails to establish a *prima facie* case, the analysis ends and her retaliation claim fails. *See, e.g., Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 349 (5th Cir. 2007). If she succeeds, however, the burden shifts to Merck to articulate a legitimate, non-retaliatory reason for its actions. *See, e.g., Long*, 88 F.3d at 304–05. If Merck satisfies this burden, Williams must then show that Merck's stated reasons are a pretext for retaliation. *See, e.g., id.* at 305.

Williams fails to establish a *prima facie* case of retaliation because she did not engaged in a protected activity. According to Williams, she complained about Pelkowski three times in late November 2006: first to Elizabeth Lyle in Merck's Ombudsman's office, second to Ann Myers in Human Resources, and third to Marc Dervishian, Pelkowski's supervisor. Williams never raised the issue of discrimination in any of these three complaints. When she complained to Lyle, she "*chose to refrain* from suggesting the use of discriminatory practices by Grace Pelkowski." When she complained to Myers, she said she "wasn't being treated right [and] felt like [she] couldn't promote within the

company." She said the same to Dervishian, stating that she "wasn't being treated the same as [her] counterparts and as Lance [Noll] and . . . [expressed her] concern with not being able to be promoted."

Complaints that fail to mention unlawful discrimination do not constitute protected activities, and cannot support a claim for unlawful retaliation. In *Turner*, the plaintiff had received counseling for poor performance. *Turner,* 476 F.3d at 342. The plaintiff, Turner, sent an e-mail to the company's CEO "to complain about Colston's [supervisor's] treatment of her during a dispute over a project, but did not mention race." *Id.* Affirming summary judgment, the Fifth Circuit found that Turner had failed to establish a protected activity, and that her claim failed as a result: "[Turner's e-mail] does not support a *prima facie* showing of retaliation. The email was sent after a conflict between Turner and Colston regarding the formatting of one of the Excel reports. The email focuses on this incident and the deteriorating working relationship between Turner and Colston." *Id.* at 349. Because Turner failed to complain about any unlawful employment practice, the Fifth Circuit upheld summary judgment. *Id.* Because Williams's complaints do not mention discrimination then her complaints do not constitute protected activities. Without protected activity, Williams cannot establish a *prima facie* case of retaliation, thus, summary judgment is appropriate.

IV.    Conclusion

- 26 -

As stated earlier, Defendant Pelkowski is **DISMISSED** on the basis of improper joinder, thereby providing this Court with jurisdiction under 28 U.S.C. § 1332.  For the reasons stated above, the Court **GRANTS** summary judgment for Defendant on all claims and dismisses this action with prejudice by judgment filed today.

**SO ORDERED.**

Signed September 2nd, 2009.


_Ed Kinkeade_
ED KINKEADE
UNITED STATES DISTRICT JUDGE